# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 19-0352

DAVID A. ANDREWS, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued December 9, 2020                          Decided June 22, 2021)

*James D. Ridgway*, with whom *Glenn R. Bergmann* was on the brief, both of Bethesda, Maryland, for the appellant.

*Alexander You*, with whom *Richard J. Hipolit*, Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Joan E. Moriarty*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before ALLEN, TOTH and FALVEY, *Judges*.

TOTH, *Judge*: "The term 'burden of proof' is one of the 'slipperiest members of the family of legal terms'." *Schaffer v. Weast*, 546 U.S. 49, 56 (2005) quoting 2 J. Strong, McCormick on Evidence § 342, p. 433 (5th ed. 1999). This appeal requires us to grasp some of the slipperiest issues in veterans law, namely how claims are proven and how this Court reviews them.

Both parties acknowledge that the Board erred in relying on an inadequate medical exam; the dispute here centers on the remedy. Marine Corps veteran David A. Andrews asks the Court to review the evidence of record and reverse the Board's ruling that service connection is not warranted for his hepatitis C, rather than remand for additional fact finding. He contends that reversal is the only proper remedy given that the evidence of record meets the "benefit of the doubt" standard spelled out in the law and specifically referenced by the statute laying out the Court's scope of review. By contrast, the Secretary contends that to reverse would require us to act as fact finder in the first instance—something we are prohibited from doing.

Ultimately, we agree with Mr. Andrews that reversal is warranted, but for a narrower reason than he advances. Based on the applicable legal standard the Board adopted in this case, the uncontested facts established to date, and the de minimis role that any additional development

could have on the claim, the Court reverses the Board decision denying service connection as to the hepatitis C and remands for VA to assign an appropriate rating and effective date.

## I. BACKGROUND

David Andrews served in the Marine Corps from 1976 until 1979. In February 2010, he sought service connection for hepatitis C, which he claimed resulted from his exposure to various risk factors he experienced while in service, including air gun immunization, dental work, and sexually transmitted disease (STD). He also sought service connection for a liver disability; we need not discuss it separately, however, as the parties agree that it is "inextricably intertwined" with the hepatitis claim.

Over the course of development, Mr. Andrews submitted various forms of evidence to support his claim, including:

- A statement in which he attributes his hepatitis C to the "battery of shots with air guns and reusable syringes" that he received during service and avers that he never got a tattoo, used drugs, or received a blood transfusion (R. at 588);
- Evidence indicating that he was diagnosed with gonorrhea while in service (R. at 33);
- Private treatment records dating from 1999 to 2010 reflecting treatment for hepatitis C (R. at 601-72);
- Photocopies of various pages from his Marine Corps yearbook, including his headshot, photos of marines receiving air gun immunizations, and photos of marines receiving dental treatment (R. at 280-83; 666-72);
- Post-service statements from friends attesting to his declining health (R. at 284-89);
- Various Board decisions in other cases granting service connection for hepatitis C as related to air gun immunizations (R. at 290-96); and
- Materials culled from the Internet related to VA's handling of hepatitis C and related claims (R. at 297-347, 351-81).

VA obtained a medical examination in 2010 in which the examiner opined that the cause of Mr. Andrews hepatitis C was "unknown" but was not related to his in-service immunizations because "air gun injections are not a risk factor" for the condition. R. at 490-91. The regional office denied his claim in December 2010.

2

Mr. Andrews appealed this decision, and the Board remanded the hepatitis C claim in 2017 to obtain a new etiology opinion on the grounds that the first VA medical examiner failed to consider Mr. Andrews's treatment for STD while in service. In remanding, the Board cited VA's *Adjudication Procedures Manual* (M21-1), which identifies "[h]igh risk sexual activity" as "a risk factor for hepatitis C." R. at 66.

Mr. Andrews was examined in September 2017 by the same examiner who produced the 2010 etiology opinion. The examiner confirmed diagnoses of hepatitis C and cirrhosis of the liver. Once again, the examiner opined that Mr. Andrews's hepatitis C was less likely than not related to service as there was "no new information" showing a link to service. Specifically, the examiner noted that Mr. Andrews was exposed to air gun immunizations in service but there was "no direct correlation with hepatitis C." R. at 48. Additionally, the examiner noted that Mr. Andrews had gonorrhea in service but that this condition is "not a known etiology for liver disease." *Id.* Finally, the examiner stated that, although Mr. Andrews had dental work in service, there was no evidence of blood transfusion or contact with blood from medical personnel.

In the 2018 decision under review, the Board denied disability compensation. Citing the M21-1, the Board observed that "[t]here are recognized risk factors for contracting hepatitis C." R. at 5-6. It also noted that Mr. Andrews competently reported experiencing some of these risk factors in service—namely, air gun injections and non-sterile dental work. However, the Board placed "great probative weight" on the September 2017 opinion for its consideration of "pertinent evidence" and its "clear conclusions and supporting data." R. at 7. By contrast, the Board discounted the evidence submitted by Mr. Andrews as falling short of the "requisite level of certainty needed to be considered probative evidence" insofar as it failed to address the etiological relationship between hepatitis C and air gun use and failed to show that unsterilized dental instruments were used in service. R. at 9. The Board mentioned the veteran's in-service STD only to the extent of recognizing the examiner's opinion that gonorrhea did not give rise to hepatitis C. And it noted the veteran's averment that there were no hepatitis C risk factors outside of service. R. at 6.

Mr. Andrews appealed to this Court, contending not only that the 2017 medical opinion was inadequate but also that the Board erred in denying service connection as the evidence of record was sufficient to establish service connection for hepatitis C. For his part, the Secretary concedes that both the 2010 and 2017 opinions are inadequate insofar as they fail to address certain

theories of entitlement. The dispute here thus centers on an appropriate remedy. The Secretary asks us to remand for another etiology opinion, while Mr. Andrews urges us to reverse, arguing that the lay and medical evidence already of record satisfies the "modest threshold" for granting service connection by establishing that a current condition is at least as likely as not related to service. Appellant's Br. at 14. That is, since the favorable and unfavorable evidence stands in equipoise or is at least in approximate balance, the veteran believes that he should get the statutory "benefit of the doubt" and that the essential evidentiary tie should be resolved in his favor. In opposition, the Secretary contends that the Court cannot apply the benefit of the doubt doctrine in the first instance because to do so would exceed our statutory authority and amount to initial appellate fact finding.

## II. ANALYSIS

### A.

Mr. Andrews's argument for reversal calls for a brief review of when that remedy is warranted and when it's not. He contends that, although this Court has long recognized its authority to reverse clearly erroneous Board findings, it has consistently neglected to do so because "it is not necessarily obvious what this means in practice." *Id.* at 14. He then sketches out how he thinks a reversal standard ought to operate in a service-connection context: A veteran is entitled to reversal wherever the totality of lay and medical evidence reaches the "modest threshold" of the "approximate balance" spelled out in 38 U.S.C. § 5107(b), even if there may be some evidence against the claim or even some substantial uncertainty as to whether the condition is actually related to service. *Id*. Per Mr. Andrews, this is the most natural reading of 38 U.S.C. § 7261(b)(1), which expressly incorporates the "benefit of the doubt" (or "approximate balance") standard into the Court's scope of review, instructing us to "take due account of the Secretary's application of section 5107(b)." Thus, he contends that reversal is appropriate because the "only permissible view of the evidence is that it weighs in favor of granting the claim regardless of whether it is possible to decide which of the three in-service risk factors"—dental work, inoculations, or STD—"was the cause of the infection." *Id*.

We readily acknowledge Mr. Andrews's point that, while the Court's authority to reverse Board findings is firmly established, it's not entirely clear what this means in practice. To be sure, we have generally established that remand is proper "where the Board has incorrectly applied the

4

law" or "failed to provide an adequate statement of reasons or bases for its determinations, or where the record is otherwise inadequate." *Tucker v. West*, 11 Vet.App. 369, 374 (1998). Whereas reversal is warranted when, despite some evidentiary support, this Court "'is left with the definite and firm conviction that'," based on the entirety of the evidence, the Board has made a mistake. *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Nonetheless, it has proven difficult to identify absolute markers as to when reversal is the appropriate remedy rather than remand for further development or adjudication.

We part ways with Mr. Andrews, however, insofar as we regard this difficulty not as a bug but as a feature of our judicial review. As we explain, our propensity for remands over reversals derives not from a perceived lack of authority or confusion about the proper legal standard, but follows unavoidably from our limitations as an appellate court and the factual complexities inherent in the evidentiary decisions VA must make in benefits cases.

It would require a treatise to do justice to the long pedigree of decisions addressing the appropriateness of reversal, so instead we survey a few cases where some governing considerations are laid out. In *Adams v. Principi*, 256 F.3d 1318 (Fed. Cir. 2001), the Federal Circuit examined our decision to remand, over the veteran's objections, to obtain clarification about what a medical examiner meant in a report. The court affirmed, noting that the remand order was "consistent with general principles of judicial review of agency decisions" whereby "the proper course" for a court having difficulties evaluating a record "'except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* at 1322 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

*Adams* spelled out a notable instance in which remand is *not* appropriate, namely, when the sole purpose of the remand is to allow the agency to develop additional evidence so that it has a proper basis to deny the claim. *Id* at 1321-22 ("This is not a case in which the court was faced with evidence that was clearly insufficient to overcome the presumption of sound condition and in which the court remanded the matter to the Board to allow [VA] to attempt to introduce new evidence sufficient to make up the shortfall."). The purpose of a remand is either to allow for further development or to require the Board to consider an issue anew and make a fully informed decision based on correct factors. *See Moore v. Derwinski*, 1 Vet.App. 401, 404 (1991) (outlining factors the Board must consider and discuss).

5

A decade later, in *Byron v. Shinseki*, 670 F.3d 1202 (Fed. Cir. 2012), a veteran's widow challenged our decision to remand a case where the Board failed to make a finding about direct service connection that might have resulted in an earlier effective date. The appellant contended that the factual record was sufficiently developed to allow us to render findings in the first instance. The Federal Circuit disagreed and identified as the salient factor whether VA had rendered an initial determination on the question. The court noted that reversal, in the absence of existing findings from the agency, is not appropriate "'except in rare circumstances'." *Id.* at 1205, *quoting Gonzales v. Thomas*, 547 U.S. 183, 186 (2006). Notably, *Byron* acknowledged situations where a reviewing court may be able to engage in initial fact finding, such as where the government has conceded relevant facts or where it is required by statute to consider harmless error. *Id.* at 1206. Absent "rare circumstances" such as these, however, "[w]hen there are facts that remain to be found in the first instance, a remand is the proper course." *Id.*

In *Deloach v. Shinseki*, 704 F.3d 1370 (Fed. Cir. 2013), the Federal Circuit addressed an argument and factual backdrop that most closely resembles this case. *Deloach* involved a consolidated set of appeals where veterans challenged this Court's remand orders on grounds that reversal was the appropriate remedy. Both *Deloach* cases involved the same pattern: this Court held that a medical examination was inadequate (along with the Board's reasons or bases for denying the claim) but declined to reverse because to do so would require us to analyze the probative value of the remaining medical evidence or otherwise find facts in the first instance. *Id.* at 1374-75.

The legal argument that the veterans raised in *Deloach* is notably similar to that Mr. Andrews makes here: "Reversal is mandated," that appellant contended, "when the records are viewed in their entirety and after they have been given the benefit of the doubt under § 5107." *Id.* at 1380. This was so, the veterans reasoned, because "the interplay between [this Court's] ability to reverse and veteran's entitlement to the benefit of the doubt" meant that the Court "has a duty to independently weigh the entirety of the evidence to determine whether the Board's factual findings are clearly erroneous." *Id.* The Federal Circuit noted that the presence of the phrase "or reverse" in 38 U.S.C. § 7261(a)(4) showed unequivocally that Congress invested this Court with the authority "to exercise reversal power in appropriate cases" and that we were "not legally restricted only to remand." *Id.* at 1379-80.

6

As to when it was *appropriate* to reverse, *Deloach* fixed upon the central fact constraining our authority: the prohibition against finding facts in the first instance, save in circumstances directed by statute. *Id.* at 1380. Congress, through 38 U.S.C. § 7261(c), prohibited this Court from conducting de novo review of the Board's factual findings—that is, setting aside findings without identifying a clear error merely because we would have ruled differently had we been the initial fact finders. *Id.* (The Court "must *review* the Board's weighing of evidence; it may not weigh evidence itself."). Relying on the same standard that this Court adopted in *Gilbert*, the Federal Circuit reiterated that, "where the Board has performed the necessary fact-finding and explicitly weighed the evidence, the Court of Appeals for Veterans Claims should reverse when, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed." *Id.*

B.

Taken together, these cases make clear that reversal is appropriate provided that it doesn't require the Court to exceed its scope of review by engaging in improper fact finding. On a practical level, however, the line often proves blurry between judicial review—that is, reviewing, under the clearly erroneous standard, discrete findings of the Board in light of the entire factual record—and first-instance fact finding. Indeed, it proves easier to articulate the distinction than to apply it to complex factual records. We submit that there are a few reasons for this.

First, evidentiary decisions are predominantly qualitative rather than quantitative in nature and so are seldom reducible to green-eye-shade accounting formulas. *See Gilbert*, 1 Vet.App. at 57. Stated differently, evidentiary rulings are not zero-sum affairs but often involve a complex interplay between several different factors. *See Schaffer*, 546 U.S. at 56 (noting the various considerations that comprise the burden of proof). For example, a Board's finding may be set aside because it erroneously discounted someone's credibility or accorded too much significance to a particular factor vis-à-vis countervailing factors and so forms an implausible reading of the evidence. But pointing out a clear error in the Board's evidentiary assessment does not automatically establish the opposite finding, such that a statement is automatically rendered credible or contrary evidence must carry the day. A reduction on one side of the evidentiary ledger does not necessarily credit a gain for the other. *See, e.g.*, *Garland v. Ming Dai*, 141 S. Ct. 1669, 1681 (2021) (noting that testimony on a key fact may be deemed credible yet still found to be "outweighed by other evidence and thus unpersuasive or insufficient to" meet the burden of proof).

The probative value of evidence is highly contextual and it's often difficult to assess how a particular error impacts the overall evidentiary picture. For this reason, the usual remedy is to require the Board to readjudicate the issue anew without the taint of the error. *See, e.g.*, *Stevens v. Principi*, 289 F.3d 814, 817-18 (Fed. Cir. 2002) ("When an agency has employed the wrong legal standard in evaluating evidence in the case, the appropriate remedy is normally for the reviewing court to remand the case to the agency for the agency to reassess the evidence under the correct factual standard.").

Second, even if our statutory authority to reverse factual findings were absolute, that would not solve the problem concerning what law we would consider in determining whether Mr. Andrews satisfied the relevant factors for awarding service connection for hepatitis C. Although sections 5107 and 7261 establish respectively the veteran's burden of proof and our scope of review, they provide no insight about what factors might prove relevant in a specific claim. By contrast, 38 U.S.C. § 501(a)(1) authorizes the Secretary, and not this Court, to prescribe regulations "with respect to the nature and extent of proof and evidence and the method of taking and furnishing them in order to establish the right to benefits under such laws."

In short, our ability to evaluate evidence can be complicated when there isn't a statute or regulation spelling out precise criteria or relevant factors that bear on a given question. Often the relevant adjudicatory standard is set out in an agency manual such as the M21-1, whose provisions are mandatory for adjudicators at VA regional offices, but whose relationship with the Board and this Court is less than straightforward.

On the one hand, the M21-1 is not binding on either the Board or this Court; we thus held in *Overton v. Wilkie*, 30 Vet.App. 257, 263 (2018) that "to support its decision the Board can't simply cite an M21-1 provision without further analysis" but must provide some reasoning as to why it relied on the provision. Thus, the M21-1 falls somewhere short of a substantive provision that directs an outcome on its own force. On the other hand, recent precedential decisions have emphasized the central role the M21-1 plays in the adjudicating cases. In *Healev v. McDonough*, 33 Vet.App. 312, 320 (2021) we noted that the M21-1 constitutes a "relevant factor" and so the Board can't ignore it in its analysis of the adjudication but must provide reasoning for declining to follow the provision. Still further, the Federal Circuit recently held that at least some M21-1 provisions are subject to review under 38 U.S.C. § 502, which is how substantive rules are evaluated under the Administrative Procedure Act (APA). *National Organization of Veterans'*

*Advocates, Inc. v. Sec. Veterans Affairs*, 981 F.3d 1360, 1377-78 (Fed. Cir. 2020) (en banc); *see* 5 U.S.C. §§ 552, 553 (APA).

The M21-1 thus serves a central role in veterans law even as it's complicated to pin down its exact relationship to the Board or this Court. As cases like *Overton* and *Healey* demonstrate, the significance ascribed to the M21-1 in an individual appeal often turns on the context of the case and the nature of Board's analysis and treatment of the provision—that is, whether and to what extent it relied on or departed from the provision and the rationale behind such decision.[1]

What this means is that it is less than clear the extent to which this Court can involve the M21-1 in *our* scope of review by directing our judgment as to whether the veteran met the burden of proof based solely on factors spelled out in the M21-1. Evidence is probative to the degree that it addresses factors specific to the adjudication. But without a clear target (or authorization from Congress to establish our own criteria), it's difficult to assess whether or to what degree evidence hits the mark.

C.

All that said, every case turns on its specifics. This case is fundamentally about the appropriateness of the remedy in light of the evidence of record produced by the development to date. The general discussion above about the scope of our review in relation to the M21-1 was necessary to resolve the broader arguments advanced by Mr. Andrews. As noted, the role the M21-1 plays in an appeal to this Court often turns on the Board's treatment of it in a particular case. Here, the Board in its 2017 remand order incorporated the M21-1 provision relevant to hepatitis C into the development of the claim and applied its substantive provisions regarding risk factors in its 2018 decision. The Secretary—having conceded that both pre- and postremand VA medical opinions have been inadequate until this point—urges us to remand for yet another one. As explained below, we conclude that reversal is appropriate.

The relevant M21-1 provision recognizes various risk factors for hepatitis C, such as blood transfusions, tattoos or body piercings, puncture with non-sterile needles, high-risk sexual activity, and air gun injections (though this last factor comes with caveats). M21-1, Pt. III, sbpt. iv, ch. 4, sec. H.2.e. The manual also instructs: "Resolve reasonable doubt . . . in favor of the Veteran when

---

[1] To be clear, given our disposition of this appeal, we have no call to consider precisely how—if at all—the Federal Circuit's recent en banc decision in *NOVA* affects whether an M21-1 provision binds the Board in the absence of the Board itself adopting such a provision as the rule of decision in a given appeal.

the evidence favoring risk factor(s) in service is equal to the evidence favoring risk factor(s) before or after service." *Id.*

Even though we likely could not independently turn to the M21-1 to inform our decision of whether the Board erred in determining that Mr. Andrews hasn't met his burden of proof, doing so is appropriate here because the Board's 2017 remand order and 2018 decision adopted the M21-1's guidance on adjudicating service connection for hepatitis C in this case.

The Federal Circuit ruled in *Hudick v. Wilkie*, 755 F. App'x 998, 1006–07 (Fed. Cir. 2018) that, once the Board cited the M21-1 in a remand order and so invited the veteran to submit evidence reflecting compliance with its provisions, it effectively incorporated that provision and couldn't later ignore it when adjudicating a claim. Although unpublished and therefore not binding as precedent, *Hudick* nonetheless bears critical insight: The Board's citation to a manual provision amounts to a tacit recognition that the provision constitutes authority in the case. As in *Hudick*, the Board here also cited to specific provisions from the M21-1 and directed the regional office to obtain a new etiology opinion and to identify high risk sexual activity as a risk factor for hepatitis C. By specifically incorporating the relevant M21-1 provision into the remand order, the Board rendered this authority binding on the regional office in terms of how it developed the claim and how the Board would readjudicate it if the matter returned there. As *Hudick* put it: "It cannot be that the VA may tell a veteran how to establish a service connection for his [condition] only to move the goalposts once he has done so. This kind of goalpost-moving does not reflect an optimal mode of administrative decisionmaking." 755 F. App'x at 1007 (quotation marks omitted). Because the Board "did not identify or analyze any evidence that cut against" Mr. Hudick's statements, and because the M21-1 provision required only that he provide "*credible* evidence" of in-service exposure to justify the grant of service connection, the Federal Circuit concluded that the claim had to be granted "under the proper adjudicatory framework based on facts already found by the Board." *Id.* at 1008-09.

We find the Federal Circuit's reasoning persuasive in the circumstances of this case and thus review the Board's assessment of the evidence with respect to the claim in light of the relevant M21-1 provision. The Board adopted the M21-1's substantive recognition of specific risk factors in the development of hepatitis C. Next, it was cognizant of the veteran's assertion that he experienced no risk factors outside of service. Because it didn't in any way impugn this assertion, we take the Board to have accepted it as credible. *See Miller v. Wilkie*, 32 Vet.App. 249, 261 (2020)

10

("When the Board has made its decision without finding that the veteran is not competent to report symptoms and nothing suggests that the Board failed to review the evidence at issue, we may reasonably conclude that it implicitly found the veteran credible."). As for in-service risk factors, the Board did not dispute their occurrence; it merely discounted the likelihood that the veteran's hepatitis C originated from some of them. But the medical evidence the Board relied on to do so has been conceded as inadequate, since the opinions either failed to understand the theory of service connection at issue or rejected—contrary to VA policy—the possibility that certain risk factors could lead to hepatitis C. Put simply, no matter how diminished the Board thought the likelihood that Mr. Andrews's in-service risk factors caused his hepatitis C, this must be weighed against the absence of extra-service risk factors.

At the very least, in this case "the evidence favoring risk factor(s) in service is equal to the evidence favoring risk factor(s) before or after service," requiring resolution of reasonable doubt in the veteran's favor. M21-1, Pt. III, sbpt. iv, ch. 4, sec. H.2.e. Reasonable doubt exists when there is "an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim. It is a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility." 38 C.F.R. § 3.102 (2020). To the extent that the Board found the risk factor evidence in favor of the claim didn't meet this standard, this finding was clearly erroneous.[2]

Nor, based on this record, can we see any point in remanding for additional development on the question of nexus. VA must "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate" a claim for benefits. 38 U.S.C. § 5103A(a)(1). As to how much discovery is necessary, 38 C.F.R. § 3.304(c) requires the Secretary to develop evidence in connection to claims for service connection "when deemed necessary," but that such development "should not be undertaken when evidence present is sufficient for this determination." We have construed the "when deemed necessary" language as providing the Secretary with a measure of discretion to determine how much development is necessary based on the particular facts of a case. *Shoffner v. Principi*, 16 Vet.App. 208, 213 (2002).

---

[2] We pause to note that we have not independently determined how the M21-1 provision at issue should be applied. Rather, we utilize the approach the Board and the regional office employed in which the presence of the listed risk factors in service is compared to those present pre- and postservice. There may be more to how the M21-1 provision should properly be administered. What we do today is simply utilize the view of the M21-1 provision the Board adopted for the adjudication of this appellant's claim.

We're mindful of the Federal Circuit's reasoning in *Adams*: Remand is inappropriate where the predominant purpose is not to allow the Board to make a fully informed decision unencumbered by error but to allow VA to obtain more evidence so that it can properly deny the claim. *See Adams*, 256 F.3d at 1321-22. For a reviewing court, the key factor is not the weight of the evidence already of record but whether the remand serves a purpose beyond allowing VA to obtain evidence to deny a claim.

Here, there has already been substantial development during the pendency of the claim addressing the various risk factors to which Mr. Andrews was exposed: VA obtained two medical examinations and the veteran submitted numerous private treatment records and lay statements. Yet despite all this development, VA has not suggested, much less identified, the existence of pre- or postservice risk factors necessary to deny service connection under the standard outlined in the M21-1. Even if another examiner once more discredits the notion that Mr. Andrews's in-service risk factors led to his hepatitis C, that still puts the likelihood of an in-service etiology at least on par with the likelihood of an extra-service etiology. In short, it's not clear what remedial value would lie in requiring VA to obtain a new examination, since that examiner would have no warrant to reject the fact that no non-service risk factors exist. Regardless of the relative probative value of the evidence supporting Mr. Andrews in-service risk factors, this much is clear: it at least matches the *zero* evidence suggestive of pre- or postservice risk factors.

Which brings us to the final point: Whatever the quality of the evidence surrounding the risk factors, it's at least sufficient to allow VA to discern whether service connection is warranted. It's been nine years since VA began assisting Mr. Andrews to develop his case. Despite formally recognizing the M21-1 risk factors, the Board relied on a medical examination that was not only inadequate for failing to address the in-service risk factors but failed to identify any viable non-service-related etiology for the veteran's condition.

Based on the circumstances of this case—the adoption of the M21-1 standard, the conceded presence of in-service risk factors, the absence of any non-service risk factors, and the lack of any reasonable basis to believe that additional development could alter the approximate balance of evidence—the Court reverses and orders VA to award service connection to Mr. Andrews for hepatitis C.

### III. CONCLUSION

The Court REVERSES the Board's October 1, 2018, denial of service connection for hepatitis C and REMANDS for the assignment of a proper rating and effective date. The Court VACATES the denial of service connection for a liver disability based on its inextricable intertwinement with the hepatitis C claim and REMANDS the matter for readjudication consistent with this opinion.